**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

ANTHONY WILLIS,

     Plaintiff,

v.                        Civil No. 05-CV-10072-BC

COMMISSIONER OF           DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

     Defendant.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.**     **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, IT IS RECOMMENDED that PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, and that the FINDINGS OF THE COMMISSIONER BE AFFIRMED.

**II.**     **REPORT**

     **A.**     **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case has been referred to this Magistrate Judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability

insurance benefits.  This matter is currently before the Court on cross motions for summary judgment.

Plaintiff was 48 years of age at the time of the most recent administrative hearing and has completed a high school education.  (Tr. at 522-23.)  Plaintiff's relevant work history includes four years' work as a quality control inspector for a transmission factory, three years' work in customer service for a paint company, five years's work as a shipping and receiving clerk for a distribution center, and seven years' work as a supervisor/laborer for an automotive paint factory.  (Tr. at 210.)

Plaintiff filed the instant claim on March 8, 2001, alleging that he became unable to work on May 5, 2000.  (Tr. at 74-76.)  The claim was denied initially.  (Tr. at 33.)  In denying Plaintiff's claim, the Defendant Commissioner considered sprains and strains and organic mental disorders (chronic brain syndrome) as possible bases of disability.  (*Id.*)

On April 8, 2004, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) James Norris, who considered the case *de novo*.  In a decision dated July 29, 2004, the ALJ found that Plaintiff was not disabled.  (Tr. at 12-28.)  Plaintiff requested a review of this decision on September 21, 2004.  (Tr. at 10.)

The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1-2, Tr. at 511-12), the Appeals Council, on January 3, 2005, denied Plaintiff's request for review.  (Tr. at 6-9.)  On March 4, 2005, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

---

[1]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

**B.     Standard of Review**

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam).  The Commissioner is charged with finding the facts relevant to an application for disability benefits.  A federal court "may not try the case de novo, . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).  The scope of the court's review is limited to an examination of the record only.  *Brainard,* 889 F.2d at 681.  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L. Ed. 2d 126 (1938)).  The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts.'"  *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility. *Garner,* 745 F.2d at 387-88.

## C.    Governing Law

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen*, 800 F.2d at 537.

4

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

A claimant must meet all five parts of the test set forth in 20 C.F.R. § 404.1520 in order to receive disability benefits from Social Security. The test is as follows:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.

> Step Three: If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.

> Step Four: If the claimant is able to perform his or her previous work, benefits are denied without further analysis.

> Step Five: If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th

Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Preslar*, 14 F.3d at 1110. "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.* "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ." *Id.*

### D.   Administrative Record

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that on May 5, 2000, Plaintiff was seen at Oakwood Hospital emergency department after being hit in the head and the left shoulder by a large drum while at work. (Tr. 366.) Examination of the cranial nerves was normal, as were a number of neurological tests, but Plaintiff's shoulder evidenced decreased range of motion. Rotator cuff tear testing was negative. (*Id.*) Plaintiff was diagnosed with multiple contusions, including head contusion with loss of consciousness. (*Id.*) An x-ray of Plaintiff's left shoulder revealed no acute fracture or misalignment, however, it was noted that some tendinitis was possible. A CT scan of the head revealed no significant intracranial finding or abnormality. (Tr. at 441-43.) An x-ray of Plaintiff's left distal forearm and wrist was negative. (Tr. at 366.)

Between May 8 and June 1, 2000, Plaintiff underwent physical therapy at the Concentra Medical Centers. (Tr. at 323-48.) By June 1, Plaintiff reported a 75-80% improvement in his ability to use his left arm. (Tr. at 323.) The therapist reported that Plaintiff could lift and carry up to 50 pounds and push and pull up to 150 pounds. (*Id.*; *see also* Tr. at 325.)

Plaintiff was seen by Dr. Jeffrey Lawley on June 15, 2000, for assessment of his left shoulder. (Tr. at 365.) The doctor stated that Plaintiff showed no pain with his arm at his side, but

he had difficulty elevating his arm.  Plaintiff's shoulder showed diffuse tenderness but no swelling or discoloration.  Dr. Lawley recommended an MRI of Plaintiff's left shoulder to assess for a possible torn rotator cuff tendon.  Dr. Lawley felt that Plaintiff could work with a ten-pound weight restriction, as well as no overhead type work using his left hand, and only limited pushing, pulling and reaching.  (*Id.*)  On July 15, 2000, Plaintiff underwent an MRI of the left shoulder. The test revealed a tendon tear of moderate to large size, moderate joint arthropathy, and rotator cuff impingement.  (Tr. at 444-45.)

 On July 12, 2000, Plaintiff underwent a psychiatric examination conducted at the request of the Disability Determination Service by Dr. F. Qudir.  Plaintiff told the doctor that he occasionally went to church and did light household chores with his wife's assistance. (Tr. at 300.) Plaintiff stated that he spent much of his time watching television.  The doctor reported that Plaintiff's thought processes were well organized, spontaneous and logical. (Tr. at 301.) Plaintiff denied any hallucinations, delusions, or feelings of helplessness or worthlessness.  (*Id.*)  He did, however, describe sleep disturbances, and the doctor felt that Plaintiff's mood was depressed and his affect constricted although generally appropriate. (*Id.*)  Plaintiff described occasional memory problems since his accident, such as forgetting to do things he was supposed to do.  Plaintiff also said his concentration and comprehension were decreased.  (*Id.*)  The doctor diagnosed an adjustment disorder with anxiety and depression due to head injury.  (*Id.*)  The doctor assessed a GAF[2] score  of 50 and rated Plaintiff's prognosis as "guarded."  (*Id.*)

---

[2]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning.  This information is useful in planning treatment and measuring its impact and in predicting outcome.  The reporting of overall [psychological, social, and occupational] functioning on Axis V can be done using the Global Assessment of Functioning (GAF) Scale."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).  A GAF Scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships; a scale of 51-60 indicates moderate symptoms (e.g.,

Plaintiff was examined at the request of his workers' compensation attorney on February 20, 2001, by Dr. Victor Gordon. (Tr. at 423-24.)  Surgery was recommended for Plaintiff's left shoulder, but Plaintiff stated he wanted his own doctor to do it, "which was denied him." (Tr. at 424.)  Plaintiff reported that he had occasional headaches, that his left shoulder pain was still present but diminished, and that pain increased with upper extremity use.  He also reported low back pain, especially with prolonged sitting and standing or lifting and bending.  (Tr. at 424.) On examination, cranial nerves were normal, and muscle stretch reflexes were equal.  (Tr. at 426.) Range of motion in the left shoulder was diminished by approximately 10 %. (Tr. at 427.) Plaintiff's gait was normal, and he was able to walk on heels and toes.  Muscle strength was also normal. (*Id.*)  Straight leg raising tests produced some pain at 80 degrees, but neurological tests of the back were normal.  Neurological tests of the left shoulder were positive.  (*Id.*)

Electrodiagnostic studies were normal.  (Tr. at 428.)  Plaintiff was diagnosed with impingement syndrome of the left shoulder with rotator cuff tendinitis, degenerative joint disease at the AC joint, chronic lumbosacral myofascial strain, arthropathy of the lower lumbar segments, and possible post concussion syndrome.  (*Id.*)  Dr. Gordon recommended that Plaintiff avoid activities requiring him to lift or carry in excess of 15 to 20 pounds, and that lifting and carrying should be done at the waist level only.  He was also advised to avoid vigorous pulling, pushing, reaching, and bending.  Plaintiff was given anti-inflammatory medication and was advised to have physical therapy and to lose weight.  (Tr. at 428-29.)

---

flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers); a scale of 41-50 indicates serious symptoms e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a scale of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

On May 7, 2001, Plaintiff was seen by Dr. Wasim Qazi, M.D. Physical examination was normal, and Plaintiff was advised to continue his current medication for hypertension. He was also advised that his cholesterol and triglycerides were somewhat elevated. (Tr. at 462.)

On May 15, 2001, Plaintiff underwent a physical examination conducted at the request of the Disability Determination Service by Dr. Seth Cohen. The doctor found no tenderness in Plaintiff's lumbosacral spine nor obvious spinal deformities. (Tr. at 286.) Plaintiff's legs appeared normal, and the doctor noted that Plaintiff was able to get on and off the examining table without assistance, and no paravertebral muscle spasm was noted. (Tr. at 287.) Deep tendon reflexes were normal, and straight leg raising was normal to 90 degrees. Other neurologic tests were negative. Plaintiff was able to walk on heels and toes and walk normally. Grip strength was reduced on the left hand. (*Id*.) Plaintiff was able to bend forward 60 of the normal 90 degrees and extend his back 15 of the normal 30 degrees. (Tr. at 288.) Plaintiff exhibited an approximate 20% decrease in range of motion of the left shoulder. (*Id*.) Testing of the cranial nerves was normal. (Tr. at 287.) The doctor noted a history of periodic headaches and a history of left shoulder pain diagnosed to be a tear of the left rotator cuff. The doctor also noted a history of memory problems and lumbar pain. (*Id*.)

On August 17, 2001, Plaintiff was seen at the request of his workers' compensation attorney by Dr. John Blase, Ph.D, for neuropsychological testing and evaluation. (Tr. at 410-15.) Plaintiff reported that he had headaches, memory difficulties and poor concentration. He complained of depression and noted that he had an anxiety attack for which he was hospitalized for two days. He also reported pain in his low back and difficulty with prolonged standing and walking. (Tr. at 411.) Plaintiff underwent examination and was administered a battery of tests. The doctor indicated that the test results showed no intent to embellish his condition. (Tr. at 412.) Plaintiff's

I.Q. was measured in the "average" range, and the doctor felt Plaintiff's scores on memory tests were generally consistent with his I.Q. (Tr. at 413.) Neuropsychological testing revealed a mild range of impairment, as well as depression and anxiety. (Tr. at 414.) The doctor felt that Plaintiff suffered "significant cognitive residuals as a result of his traumatic brain injury[.]" (*Id*.) Plaintiff was diagnosed with cognitive disorder, depression and anxiety secondary to trauma, head injury, and a GAF score of 55 to 65. Dr. Blase recommended cognitive rehabilitation, psychological counseling and follow-up testing in 8 to 12 months. (Tr. at 414-15.)

On October 1, 2001, Plaintiff underwent further evaluation and assessment of his cognitive, behavioral, and affective function status. Plaintiff was examined by Dr. Rhonda Levy-Larson, Ph.D., who found that Plaintiff's profile was not consistent with the diagnosis of a traumatic brain injury. She felt that his profile reflected difficulty coping with self-perceived somatic symptoms. The doctor found that Plaintiff had psychosocial and environmental problems, occupational and economic problems, and problems relating to interaction with the legal system. Plaintiff had a GAF score of 61. (Tr. at 421-22.) Based on the limited medical records available to the doctor, she felt that from a neuropsychological viewpoint, Plaintiff could continue and/or resume all of his normal activities, including work. She did not feel that he needed further cognitive or psychological treatment. (Tr. at 422.)

On February 2, 2002, Plaintiff reported to the emergency room due to neck and arm discomfort, mild pressure, and a weak feeling in his left upper arm. Plaintiff had run out of previously prescribed medications and was anxious about the feelings he was experiencing. (Tr. at 458.) A chest x-ray was unremarkable (Tr. at 455.) An EKG showed significant sinus

bradycardia[3] with a heart rate of about 45.  (Tr. at 457.)  Plaintiff was admitted to the hospital with chest pain and difficulty breathing.  He was diagnosed with unstable angina, received a stress echocardiogram, which was negative, and was discharged in stable condition to follow up in one week.  (Tr. at 459.)

Plaintiff was seen by Dr. Qazi again on April 22, 2002, at which time examination was normal, and his hypertension was well controlled.  He was advised to continue his medications. (Tr. at 463.)  On August 9, 2002, Plaintiff was again advised to continue his medication and was told that his hypertension was well controlled. (Tr. at 464.)

Plaintiff underwent testing at Henry Ford Health System on December 22, 2003, due to an elevated white blood cell count.  Plaintiff reported having a blackout on August 2003, at which time the elevated count was discovered.  Plaintiff did not report any other problems other than anxiety.  He weighed 266 pounds, and his blood pressure was 153/86.  (Tr. at 476.)  Blood was taken for leukemia studies, which found no evidence of the disease.  (Tr. at 475.)

Plaintiff was seen again at Henry Ford for follow up on January 21, 2004.  Plaintiff's weight was 270 pounds and blood pressure was 146/82.  Examination was normal, and the doctor's impressions were lymphocytosis and a history of elevated rheumatoid factor.  (Tr. at 481.) Plaintiff was advised to schedule an appointment for a bone marrow aspiration and biopsy, a CT scan of the chest, abdomen and pelvis, and further blood tests, with a follow-up appointment in three weeks.  (Tr. at 482.)

A CT scan of Plaintiff's thorax, abdomen and pelvis was performed on January 26, 2004. The scan showed a borderline enlarged lymph node in the abdomen, a less than 1 cm. lesion in the

---

[3]Bradycardia is a slowness of the heart beat; a condition of bradycardia exists when the rate of the beat is 60 or less per minutes.  1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE B-178.

right upper abdomen, and some diverticulosis in the pelvis. (Tr. at 491.) A bone marrow test obtained normal results for three of the five probes. Two of the probes were abnormal. (Tr. at 493.)

At the administrative hearing, a vocational expert (VE) testified. He characterized Plaintiff's prior work to be semi-skilled and medium to heavy in exertion. (Tr. at 543-44.) Later in the hearing, Plaintiff was asked to presume a person of Plaintiff's circumstances who was limited to medium exertional work which required no overhead lifting or frequent pushing or pulling, involving no more than simple and repetitive tasks not requiring significant organizational skills. (Tr. at 565.) In response to the hypothetical question, the VE identified 20,000 to 30,000 light to medium exertion general assembly jobs, and 15,000 to 20,000 light exertion inspection work office clean up jobs. (*Id*.)

At the administrative hearing, Dr. Anne Kennedy also testified as a medical expert. In response to questions relating to Dr. Blase's finding, Dr. Kennedy stated that the term "cognitive disorder not otherwise specified" meant that it was a condition which did not meet the listings or categories stated in the DSM IV [Diagnostic and Statistical Manual of Mental Disorders (4th ed.)] listings. (Tr. at 546.) The doctor testified that the test results obtained by Dr. Blase could indicate some interference with memory and concentration, functions the doctor identified as "executive functioning[.]" (Tr. at 547-48.) The doctor testified that impairments of this nature restrict individuals in the work setting to jobs that are routine and structured. (Tr. at 549-50.) The doctor felt that the test results were indicative of an individual able to function at the "midrange of what we put simple and repetitive . . . and total non-interference[.] (Tr. at 551.) The doctor felt that the test results and evidence of record did not indicate that Plaintiff's medical condition met or equaled any of the Commissioner's listed impairments. (*Id*.)

12

Under cross examination, the doctor testified that the prognosis "guarded" means "that you don't know how it's going to come out." (Tr. at 552.) The doctor acknowledged that this was a prediction based on the examination of the patient. (Tr. at 553.) The doctor testified that an adjustment disorder would likely not effect a person's ability to do simple repetitive tasks, but an amnestic disorder could. (Tr. at 554-55.) The doctor stated that the diagnoses given by Dr. Blase did not meet or equal the Commissioner's listed mental impairments. (Tr. at 555.) The doctor felt that based on the information available, Plaintiff should, from a mental and emotional point of view, be able to undertake gainful activity on a regular basis. (*Id.*)

Doctor Lorber, an orthopedic specialist, also testified as a medical expert. In response to questions from the ALJ, and after summarizing his understanding of the medical records, the doctor felt that Plaintiff's condition did not meet or equal any of the Commissioner's listed impairments. (Tr. at 563-64.)

### E.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since May 5, 2000.[4] (Tr. at 27.) At step two, the ALJ found that Plaintiff's left rotator cuff tear with degenerative joint disease of the left shoulder, mild cognitive disorder, depression, and anxiety were "severe" within the meaning of the second sequential step. (*Id.*)   At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could not perform his past relevant work. (*Id.*) At step

---

[4]Although the ALJ found that Plaintiff had earned approximately $2,900.00 in 2002 and over $10,000.00 in 2003, he found these amounts "insufficient" to render him ineligible for benefits, concluding that Plaintiff met the Social Security Act's insured status requirements since the date of his injury. (Tr. at 16, 26-27.)

five, the ALJ denied Plaintiff benefits because Plaintiff could perform a significant number of jobs available in the national economy. (*Id*.)

Using the Commissioner's grid rules as a guide, the ALJ found that:

> . . . there are a significant number of jobs which the claimant can perform in his local region, consistent with his age, education, past relevant work, and the exertional and non-exertional limitations described in his residual functional capacity. Specifically, there are unskilled light to medium level jobs which he can perform consisting of general assembly (20,000 to 30,000 jobs); and inspectors (15,000 to 20,000 jobs).

(*Id*. ¶ 10.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that Plaintiff possessed the residual functional capacity to undertake medium work. (Tr. at 27.) 20 C.F.R. § 404.1567(c) states that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

In determining what constitutes substantial evidence, I note at the threshold that Plaintiff saw a chiropractor. Chiropractors are not granted the same status as other licensed medical practitioners under the rules governing social security claims. 20 C.F.R. § 404.1513. Therefore, Plaintiff's treatment relationship with Dr. Cogan (Tr. 240-284) is not entitled to the special consideration of a treating physician under 20 C.F.R. § 404.1527. *Lucido v. Barnhart*, 121 Fed. Appx. 619, 621 (6th Cir. 2005).

Plaintiff argues that substantial evidence fails to support the ALJ's finding that Plaintiff could return to medium exertion work. Social Security Ruling (SSR) 83-10 elaborates on this definition as follows: "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." This ruling is as binding on the Commissioner as the regulation on which it is based. OHA [Office of Hearings and Appeals] Handbook § 1-161. With this definition in mind, I suggest that substantial evidence fails to support the finding that the Plaintiff can return to medium exertion work.

I first suggest that the Commissioner's characterization of Dr. Lorber's testimony is not entirely accurate. The doctor's opinion was that "this individual has restrictions with regard to his residual functional capacity with regard to frequent overhead use of his left upper extremity, frequent pushing or pulling with the left upper extremity, but he still falls into the light to medium level of activities." (Tr. at 564.) This opinion, I suggest, does not encompass all the elements of "a full range of medium work" as defined in SSR 83-10. The doctor's opinion fails to take into consideration the standing and walking, as well as total endurance and frequent lifting requirements embodied in that ruling. While physical therapy records indicate that on at least one occasion Plaintiff may have been able to meet the lifting requirements of medium work, (Tr. at

15

323), there is similarly in these records no evidence of ability to undertake the standing and walking, as well as frequent lifting entailed in medium exertion work.

Importantly, however, the Commissioner's definition of medium work ends with the statement that "if someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).  After review of the medical evidence, I suggest that substantial evidence supports the finding that Plaintiff is capable of light or sedentary exertion work.  First of all, the results of physical therapy earlier described clearly place Plaintiff's lifting capacity capability within the Commissioner's definition of sedentary or light work.  (Tr. at 323-327.) 20 C.F.R. § 1567(a)(b).  Dr. Lawley's June 15, 2000, assessment of Plaintiff's capabilities is consistent with sedentary exertion work.  (Tr. at 365.)  Dr. Gordon's February 20, 2001, findings are consistent with sedentary and light exertion work.  (Tr. at 428-29.)  Although the findings of the test conducted at Henry Ford Hospital in January 2004 could indicate disease in Plaintiff's lymphatic system (Tr. at 482, 491, 493), there is no evidence on this record that this medical condition has actually impaired Plaintiff's residual functional capacity.  Moreover, as noted by the ALJ, and while not sufficient per se to disqualify him from benefits, I suggest that Plaintiff's social security earnings records, which indicates that he earned approximately $2,900 in 2002 and over $10,000 in 2003, are inconsistent with a finding of disability.  (Tr. at 77-82.)  I further suggest that the ALJ correctly determined that Plaintiff's physical impairments do not meet or equal the Commissioner's listed impairments, particularly listing 1.02B.[5]  (Tr. at 23.)

---

[5]This listing requires:

    1.02  Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

16

As to Plaintiff's claim of disabling mental impairment, the Commissioner has promulgated a special technique to ensure that all evidence needed for the evaluation of such a claim is obtained and evaluated. This technique was designed to work in conjunction with the sequential evaluation process set out for the evaluation of physical impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. Congress laid the foundation for making disability determinations when mental impairments are involved in 42 U.S.C. § 421(h), which provides:

> An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

20 C.F.R. § 404.1520a explains in detail the special procedure, and requires the completion of "a standard document outlining the steps of this procedure." 20 C.F.R. § 404.1520a(d). The regulation further requires the standard document to be completed and signed by a medical consultant at the initial and reconsideration levels, but provides other options at the administrative law judge hearing level. *Id*. Under this procedure, the Commissioner must first make clinical findings, (i.e. the "A" criteria), as to whether the claimant has a medically determinable mental disorder specified in one of eight diagnostic categories defined in the regulations. *See* 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A. Then the Commissioner must measure the severity of any mental disorder; that is, its impact on the applicant's ability to work. This is assessed in terms of a prescribed list of functional restrictions associated with mental disorders, (i.e. the "B" criteria).

---

. . . .

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P., App 1.

The "B" criteria identify four areas which are considered essential to the ability to work. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C. The first area is "activities of daily living." This area requires the Commissioner to determine the claimant's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills. (*Id*.). Under the second criterion, "social functioning," the Commissioner must determine whether the claimant can interact appropriately and communicate effectively and clearly with others. (*Id*.). The third function, "concentration, persistence and pace," refers to the claimant's ability to sustain focused attention sufficiently long to permit the timely completion of tasks found in work settings. (*Id*.). The final area, that of "deterioration or decompensation in work or work-like settings," refers to the claimant's ability to tolerate increased mental demands associated with competitive work. (*Id*.).

If the first two "B" criteria receive ratings of "none" or "slight," the third a rating of "never" or "seldom," and the fourth a rating of "never," the Commissioner will conclude that the mental impairment is not severe, and therefore cannot serve as the basis for a finding of disability. 20 C.F.R. §§ 404.1520a(c)(1) and 404.1521. If, on the other hand, the "B" criteria indicate that the mental impairment is severe, the Commissioner must then decide whether it meets or equals a listed mental disorder. 20 C.F.R. § 1520a(c)(2). The Commissioner will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the "B" criteria have been met. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02, *et. seq*. If the severe mental impairment does not meet a listed mental disorder, the Commissioner must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The findings of a psychologist are relevant in establishing the existence and severity of a mental

impairment, and a psychologist's evaluation of the disabling nature of a mental impairment need not be given less weight than that of a psychiatrist. *Crum v. Sullivan*, 921 F.2d 642 (6th Cir. 1990).

In this case, as to the "A" criteria, the ALJ considered the evidence in light of the Listings for "organic mental disorder," "affective disorders," and "anxiety related disorders" (20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06). (*See* Tr. at 23.) Turning to the "B" criteria, the ALJ found that Plaintiff's mental impairment led to mild restrictions in daily living, mild difficulties in maintaining social function, and at most, moderate difficulties in maintaining concentration, persistence and pace. (*Id.*) Based on these findings, the ALJ concluded that Plaintiff's mental impairment did not meet the Commissioner's Listings, and engaged in the earlier described residual functional capacity analysis.

In order to find a "marked" limitation in daily activities, or a "marked" difficulty in maintaining social functioning, a plaintiff must show that the mental impairment "seriously interfere[s] with the ability to function independently, appropriately and affectively." *Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988). In *Foster*, 853 F.2d at 488, plaintiff was diagnosed with a dysthymic disorder and depressed mood. The denial of plaintiff's claim for disability was upheld based on plaintiff's testimony that she was able to cook, wash dishes, and do her laundry.

In *Vaughn v. Sec'y of Health & Human Servs.*, No. 89-2259, 1990 WL 120967 (6th Cir. Mich., August 21, 1990), the denial of plaintiff's claim for benefits, based at least in part on mental impairments, was upheld where the record showed that although plaintiff had very low self-esteem and some mental retardation, he was nonetheless generally logical, cooperative, oriented, and capable of engaging in logical and abstract thought.

19

In *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150 (6th Cir. 1990), the denial of plaintiff's claim for disability benefits based on mental impairments, was upheld where the record showed that plaintiff washed dishes, cooked, shopped, read, watched television, and drove.

In *Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1992), plaintiff was treated for depression and argued that this condition served as a proper basis for a finding of disability. The denial of this claim was upheld as the record indicated that plaintiff was able to care for herself and her son, maintain a regular schedule of daily activities, attend church, undertake vocational training, visit relatives, and drive.

In *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260 (6th Cir. 1988), the ALJ found that plaintiff's condition met both the A and B criteria of Listed Impairment 12.04. At issue was the date of disability. In that case, there was testimony that plaintiff's wife had to assist him in bathing and putting on his clothes. The plaintiff twice tried to commit suicide, and plaintiff did nothing but lie in bed and watch television. *Id*. at 264.

In *Lankford v. Sullivan*, 942 F.2d 301 (6th Cir. 1991), the court reversed a finding of nondisability and held that plaintiff there met both the A and B criteria of Listed Mental Impairment 12.08. In *Lankford*, there was abundant evidence of repeated suicide attempts, violent behavior and repeated lengthy hospitalizations for treatment of mental disorders.

The administrative record in this case reveals that after extensive psychological testing, Dr. Blase found both Plaintiff's I.Q. and measurements of memory retention in the average range. (Tr. at 413.) Plaintiff performed "adequately" on measures of sustained attention and concentration and "there were relatively few errors" found by Dr. Blase. (Tr. at 414.) In materials submitted to the Commissioner and at the administrative hearing, Plaintiff testified that he undertook odd jobs at a friend's house and helped his brother with his work, helped keep up his house, worked with

20

his children, and cooked.  (Tr. at 206-208, 532-34.)  All this evidence is, I suggest, inconsistent with a finding of disabling mental impairment.  Furthermore, as noted earlier, Plaintiff's earning capacity, as shown in the earlier cited earnings records, are similarly inconsistent with a finding of disabling mental impairment.

The facts of this case, I suggest, are much closer to those of *Foster, Young, Vaughn,* and *Hogg.  Cornette* and *Lankford*, on the other hand, stand in considerable contrast to the instant case. There is in this record no indication that mental impairments rendered Plaintiff with "no useful ability to follow work rules, deal with the public, interact with supervisors, cope with work stress or relate predictably in social situations[,]" as was the case in *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1068 (6th Cir. 1992).  Plaintiff's GAF scores are not by themselves determinative of his mental impairments.

After review of the record, I therefore conclude that the decision of ALJ Norris, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Mullen*, 800 F.2d at 545, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n. of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

  s/ *Charles E Binder*
CHARLES E. BINDER
Dated: February 3, 2006                  United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on James A. Brunson, Barry F. Keller and Ann Marie Pervan, and served in the traditional manner on Honorable David M. Lawson.


Dated: February 3, 2006                  By      s/Mary E. Dobbick
                                         Secretary to Magistrate Judge Binder